Opinion of the Court, by
Judge Owsley.
ON the first of July 1816, Griffin purchased, at the price of $600, a negro man, from John Watts, and received from him a bill of sale containing a covenant that the negro was sound, hearty, and clear of any impediment whatever. During the same year, Watts removed to the Missouri territory; but, owing to the circumstance of a negro woman he then owned, the wife of the man he had sold to Griffin, being unwilling to go with him, and having run away, Watts was compelled to hire her to Griffin until Christmas following. This negro woman afterwards came to the possession of Francis Watts, the son of John; and the negro man purchased by Griffin having died, he exhibited his bill in equity against both John and Francis Watts. The bill alleges that the negro man died of a disease of which he was afficted when John Watts sold him; charges that a colourable bill of sale has been given by John to his son Francis, of this country, for the negro woman, but insists that the woman is in fact still the property of John; asks and obtains an injunction restraining Francis Watts from disposing of the negro woman, &c. and prays for the appropriate relief.
John Watts answered, admitting the sale and warranty of the negro to Griffin; but denies that he was unsound or in any way diseased at the time of the sale. *245 He admits having removed to Missouri, but disclaims all interest in the negro woman now in the possession of his son, Francis Watts. He alleges, that being about to remove from Kentucky, the negro woman ran off, and being unable to procure her, he was compelled to hire her to Griffin, as alleged in his bill; that still apprehending it would be difficult to prevail on the woman to go to Missouri, he determined to sell, and accordingly actually sold her to his son Francis, and executed to him a bill of sale; that his son at the same time gave his obligation for six hundred dollars, payable within twelve months from its date, and that he has since released his son from the payment of the price, and now has no claim either on the negro woman or on his son for the price. He insists that the remedy of Griffin, if any he has, is not in a court of chancery, and prays to be dismissed, &c.
Francis Watts also answered, putting Griffin upon the proof of the allegations of his bill, and insisting, as his co-defendant had done, on the purchase made by him not being colourable, but for a valuable consideration and bona fide, &c.
The court, on a final hearing, pronounced a decree in favor of Griffin for $600, with interest thereon from the 10th of January 1817, the time the negro died, until paid, and ordered the negro woman in the possession of Francis Watts to be sold in satisfaction thereof. From that decree the Wattses have appealed to this court.
The propriety of the decree was contested in argument, on various grounds. It was contended, that assuming the facts to be true, as alleged in the bill, a court of chancery has no jurisdiction of the matter; but if it has jurisdiction, it was urged that the court should not have decided the cause without calling a jury to ascertain the facts and estimate the damages; and if it were proper for the court to hear and decide the cause without the intervention of a jury, it was insisted, that from the evidence in the cause no relief should have been given to Griffin.
That the case made out in the bill is properly cognizable in a court of equity, we apprehend, cannot be seriously doubted. The power of the court over such a case may be readily perceived, by adverting to the provisions of the statute of this country regulating attachments in chancery and proceedings against absent *246 defendants. That statute was admitted in argument to confer upon the court of chancery jurisdiction, in cases which would otherwise be properly cognizable at law; but it was contended, that it should not be construed, either to embrace the case of a defendant residing in another country, or to confer upon the court of chancery power to hear and decide any other description of case than a claim for a debt owing by the absentee.
The fallacy of the argument will, however, be readily perceived, by adverting to the several statutes of Virginia, from which that of this country was taken. The first was an act of 1748 regulating the proceedings in the general court, and is general in its provisions as to all suits against defendants who may be without the country; and the second is a statute of 1777 establishing a high court of chancery, and contains provisions substantially the same as those of the statute of 1748. The expressions employed in each of these statutes are not only sufficient to embrace the case of defendants residing in another country; but, by adverting to the preamble to the act of 1748, it will be perceived that the case of such defendants was within the actual contemplation of the legislature, and must have been intended to be provided for by the law-makers.
There is certainly more room to doubt whether those statutes should not be construed to apply exclusively to debts owing by the absent defendant; for although the expressions employed in the enacting part of those statutes, seem to convey a more general import, there might be a propriety in confining their operation to cases within the contemplation of the legislature; and from the preamble to the statute of 1748, the legislature seem only to have had in view the case of debts owing by absent defendants.
It was, however, to remove the doubts which arose under this branch of those statutes, that a subsequent act was passed by the Virginia legislature in 1787. That statute, after reciting that doubts had arisen whether the provisions of the law, as it then stood, applied to any other cases than those of absent debtors, declares that the same proceedings which might be had against absent debtors, may be had in all cases whatever, for any matter or thing whatever, in chancery, against absent defendants.
*247 It was obviously intended by this statute to remove the doubts which then existed as to the just import of the statutes which had been previously enacted, and to extend the jurisdiction of courts of chancery beyond that description of cases to which the existing doubts had confined it. It was, therefore, intended to confer on the court of chancery jurisdiction over other cases than debt, and the statute must be so construed as to effectuate that intent. Whether, since the enactment of this latter statute, the nature of the demand can form any restriction on the power of the court of chancery to proceed against absent defendants, it is not now necessary to enquire; for, be that as it may, we have no hesitation in sustaining the jurisdiction in all cases of contract. Whatever may be the description of contract, whether for the payment of property, or an undertaking for its soundness, there existed the same necessity for providing a remedy, where it could not be obtained in the ordinary course of law, as existed in the case of a contract for the payment of a specific debt; and as it was evidently intended to authorise a proceeding in chancery in other cases than for the recovery of a debt, there can be no principle on which the operation of the statute can be confined to any particular species of contract.
It results, therefore, that the matter alleged in the bill of Griffin is properly cognizable in chancery; and if cognizable there, no reason is perceived why the court might not, without the intervention of a jury, pronounce a final decision.
The propriety of the court deciding without calling a jury, might have been more doubtful, if, at the adoption of our constitution, the matter had been exclusively cognizable at law, and the court of chancey had taken jurisdiction under a statute subsequently enacted. A decision of the facts by the court, might then be considered an innovation on the ancient right of trial by jury, and in conflict with that provision of the constitution which declares that the ancient mode of trial by jury shall be held sacred, and the right thereof remain inviolate. But the statutes to which we have referred, were all enacted long before the adoption of the constitution, and any power which the court derived from those statutes before the adoption of the constitution, may, no doubt, now be exercised without violating any *248 constitutional provision. The statute of this country, it is true, was enacted after the adoption of our first constitution; but that statute confers no power on the court which it did not possess under the statutes of Virginia; and according to those statutes, we apprehend, the court might decide the cause without a jury. Those statutes contain no express provision as to the mode of deciding the cause; but they contain a grant of jurisdiction, and that implies a grant of all power necessary to a final decision of the matter in contest.
And with respect to the facts of the case, we entertain no doubt but the evidence fully supports Griffin’s right to relief. There is some contrariety of opinion expressed by the witnesses, as to the soundness of the negro man at the time of the warranty made by John Watts; but the weight of evidence preponderates strongly in support of the alleged unsoundness. And that the negro woman in fact belonged to John Watts, the evidence leaves no room to doubt. It is proved that John Watts gave to his son Francis a bill of sale for the woman; but it is abundantly proved that the bill of sale was not intended by either, to pass the property to Francis, but to enable them, by deluding the woman, to transfer her from this country to the Missouri territory with more facility.
The decree must be affirmed with costs and damages.